UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

**SYBREG VALENTINA CASTRO BALZA**          CASE NO.  6:20-CV-00866 SEC P

**VERSUS**          JUDGE MICHAEL J. JUNEAU

**WILLIAM P. BARR, ET AL**          MAGISTRATE JUDGE HANNA

## REPORT AND RECOMMENDATION

Before the Court is a petition for writ of habeas corpus, filed pursuant to 28 U.S.C. § 2241, and Motion for Preliminary and Permanent Injunction filed by Petitioner Syberg Valentina Casto Balza.  Rec. Doc. 1.  Petitioner is an immigration detainee in the custody of the Department of Homeland Security / U.S. Immigration and Customs Enforcement ("DHS/ICE").  She is detained at the South Louisiana ICE Processing Center (SLIPC) in Basile, Louisiana.  Petitioner alleges that she is being unlawfully detained pending her final removal order and seeks immediate release from custody under reasonable conditions of supervision.

This matter has been referred to the undersigned for review, report, and recommendation in accordance with the provisions of 28 U.S.C. § 636 and the standing orders of the Court.  Having considered the parties' submissions and the applicable law, the undersigned recommends that the Court **GRANT** the Petition requiring the **IMMEDIATE RELEASE** of Petitioner pending resolution of her

immigration proceedings or removal, and under conditions to be specified by DHS/ICE but to exclude subsequent arrest and detention, unless she violates a condition of release, attempts to abscond, or commits any criminal offense.

I.     **Background**

     a. **Petitioner's Immigration History**

Petitioner is a native and citizen of Venezuela who entered the United States on or about May 23, 2017, as a nonimmigrant visitor for pleasure with authorization to remain in the United States for a temporary period not to exceed November 22, 2017. Rec. Doc. 5-1, p. 1. Petitioner remained in the United States beyond November 22, 2017, without authorization. *Id*. Just before her period of stay on her tourist visa was going to expire, she filed an application seeking asylum in the United States. Rec. Doc. 10-1, p. 3, ¶ 6. Just one month prior to coming to the United States, when Petitioner was 18 years old and living in Venezuela, her boyfriend was murdered in front of her by members of a pro-government vigilante group. *Id*. at p. 2, ¶ ¶ 2-3; *Id*. at p. 10, *La Voz, Shooting Leaves Three Dead in the Urbanization 27th of February in Guarenas* (April 20, 2017). As she explained in her declaration submitted in support of her asylum application, Petitioner and her family were persecuted in Venezuela by pro-government vigilante groups, called "peace collectives," because they refused to support the government of the dictator Nicolas Maduro. *Id*. at p. 12.

On May 28, 2019, she pled guilty to one count of Conspiracy to Defraud the United States Which Affected Interstate Commerce in violation of 18 U.S.C. § 371 and was subsequently sentenced to imprisonment for a term of 18 months. *Id*. When she was 20 years old, she and several young Venezuelan friends became involved with several older Venezuelan men who were involved in creating fraudulent access devices using stolen identity information in order to obtain money by fraud. *Id*. at p. 3, ¶¶ 7-15. Her involvement with the principal defendants lasted only four days, when they invited her and several friends to travel with them from Miami to Mississippi, ostensibly to vacation together. *Id*. at ¶¶ 8-9. Petitioner accepted responsibility for her minimal role in the conspiracy and was sentenced to 18 months, ultimately serving 16 months before she was released to the custody of USICE. *Id*. at ¶ 15.

After serving her sentence, Petitioner was placed into removal proceedings and transferred into DHS custody. *Id*. On November 21, 2019, an Immigration Judge denied her request for voluntary departure and ordered Petitioner removed from the United States to Venezuela based on the charge(s) in the Notice to Appear. *Id*. The removal order became administratively final pursuant to 8 C.F.R. § 1241.1 on November 21, 2019, because Petitioner waived appeal of the removal order. *Id*.

ICE officers told Petitioner in May that she would be deported before the 180-day removal period concluded, and since then they have continued to tell her that

3

they are "looking for flights" to Venezuela for her. Doc. 10-1, p. 4, ¶ 20. However, Petitioner contends that ICE knew *then* that she would not be deported before the 180 days and it knows *now*, as is more fully documented below, that there are no such flights in the near future because of the diplomatic standoff between the United States and Venezuela, and because Venezuelan airspace has been closed since shortly after the outbreak of the coronavirus until now. *Id*. at pp. 27-42, Benjamin Goldfrank, PhD, Report on U.S.-Venezuela Relations and Current Conditions in Venezuela (August 2020) (hereinafter "Goldfrank Report"). ICE has been unable to secure a travel document for Petitioner for the last eight months (rec. doc. 5-1, ¶ 8); however, in August 2020, she was told her that her request for release from custody under Post-Order Custody Review (POCR) was denied because "ICE is in possession of a travel document issued by the Embassy of Venezuela to facilitate your removal from the United States." Rec. Doc. 10-1, p. 43, USICE, Decision to Continue Detention dated August 4, 2020.

    **b. Expert Opinion**

Petitioner retained Benjamin Goldfrank, a Professor of Diplomacy and International Relations and Latin American Studies at Seton Hall University, who received Masters and Doctoral degrees in Political Science from the University of California at Berkeley, and a B.A., Summa Cum Laude, from Harvard University, to present compelling evidence that the removal of Petitioner and other detained

Venezuelans is neither imminent nor likely in the reasonably foreseeable future. For the last 25 years, his research in Latin American politics has focused on Venezuela (as well as Brazil and Uruguay). He has published extensively and regularly presents at academic conferences on Venezuelan politics, and he has served as an expert witness regarding Venezuelan politics. Rec. Doc. 10-1, pp. 27, 26-42.

In his sworn report to this Court, Dr. Goldfrank sets out in detail the reasons why ICE has been unable to remove Ms. Castro and other detained Venezuelans[1] to Venezuela, and why Petitioner's removal to Venezuela is neither imminent nor likely to be accomplished in the reasonably foreseeable future. His report further establishes why the contrary opinion offered by ICE officials in this and other habeas cases before this Court is unfounded and why it should be rejected as unreliable by this Court. As explained at length by Dr. Goldfrank, since 1999, US-Venezuelan relations have long been in decline. Tensions between the two countries have increased since 2010, and especially since 2013, with the election of Pres. Nicolas Maduro. This has led to continual political crises in Venezuela and the breakdown of diplomatic relations between the two countries following 2018 elections returning Maduro to the presidency, which elections were roundly considered fraudulent and illegitimate. Id. at p. 28. Dr. Goldfrank notes that even before COVID-19, the US-

---

[1] There are currently at least two other petitions by detained Venezuelans pending before this Court. *See Gil-Maravez v. Witte, et al.,* No. 6:20-cv-00333 (W.D. La., March 13, 2020); *Gomez Barco v. Witte et al.,* No. 6:20-cv-00497 (W.D. La., April 17, 2020).

Venezuela hostilities had increased in 2019 after Juan Guiado, president of the National Assembly, declared himself president of the country, and the United States (as well as other countries) recognized him as such. This led to parallel competing "governments" within Venezuela, further economic collapse and outmigration, the closure of embassies and consulates in both countries, and the end of direct flights between the two countries. *Id*. at pp. 28-30.

Dr. Goldfrank documents in his report that after the COVID-19 pandemic began in March 2020, political and economic conditions in Venezuela as well as US-Venezuelan relations have deteriorated even further with increased sanctions and a coup attempt led by ex-Green Berets. Venezuelan airspace has been closed to all international travel since March 17, 2020, and that closure has since been renewed every 30 days, most recently on August 13, 2020. *Id*. at p. 30-32. Although the Maduro administration has occasionally allowed exceptions for flights with Venezuelan nationals arriving for repatriation from other countries, it has not done so for flights from the United States. The Guiado government – the government of Venezuela recognized by the United States – has called on the US to release Venezuelan detainees because of the impossibility of deportation. According to the Venezuelan Embassy in the United States, ICE has released 817 Venezuelans citizens from detention since September 2019 – in clear recognition that their removal to Venezuela is virtually impossible. But as of August 2, 2020, there were

still 328 Venezuelan citizens remaining in ICE detention centers with no realistic hope of repatriation to Venezuela. *Id*.

Finally, Dr. Goldfrank explains that the standoff in US-Venezuelan relations – without a regularly functioning diplomacy and without flights between the countries – is not likely to change in the near term or even medium-term. This is because Venezuela's government and particularly its health system are even less prepared than other countries in Latin America to deal with COVID-19, and the region has been hit harder than any other in the world. At the same time, Maduro and other officials in his administration have characterized returning Venezuelans as a dangerous biological threat or even bioterrorists. It is unlikely, therefore, that Venezuela will reopen its airspace anytime soon. Further, Dr. Goldfrank stresses that the political instability in Venezuela, regardless of the outcome of the United States' upcoming presidential elections, is likely to continue to deteriorate. He concludes that even if the COVID-19 pandemic were to magically subside, it is virtually impossible that regular diplomatic relations and flights will resume between the United States and Venezuela within the next six months, and it remains highly unlikely within the next year. *Id*. at p. 35-37.

## II. Law & Analysis

### A. Preliminary Injunction

The criteria for determining whether a preliminary injunction will be granted are set out in *Canal Authority of State of Florida v. Callaway*, 489 F.2d 567 (5th Cir. 1974). *Callaway* established that the following requirements must be shown before a party will be entitled to preliminary injunctive relief:

> (1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that irreparable injury will result if the injunction is not granted, (3) that the threatened injury outweighs the threatened harm to defendant, and (4) that granting the preliminary injunction will not disserve the public interest.

*Id.* at 572.

A preliminary injunction is an extraordinary remedy. *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985). It should only be granted if the movant has clearly carried the burden of persuasion on all four of the *Callaway* prerequisites. *Id.* The decision to grant a preliminary injunction is to be treated as the exception rather than the rule. *Id.* (*citing State of Texas v. Seatrain Inter. S.A.,* 518 F.2d 175, 179 (5th Cir. 1975)).

To obtain an injunction, the movant's likelihood of success must be more than negligible, *Compact Van Equipment Company, Inc. v. Leggett & Platt, Inc.*, 566 F.2d 952, 954 (5th Cir. 1978), and the preliminary injunction should not be granted unless the question presented by the litigant is free from doubt. *Congress of Racial Equality v. Douglas,* 318 F.2d 95, 97 (5th Cir.), *cert. denied,* 375 U.S. 829 (1963). It is also well-settled that "an injunction should be no more burdensome to the

defendant than necessary to provide complete relief." *Califano v. Yamasaki,* 442 U.S. 682, 702 (1979). In determining whether relief should be granted, a "[t]he district court must narrowly tailor an injunction to remedy the specific action which gives rise to the order." *In re Abbott*, —— F.3d – ——, 2020 WL 1911216 (5th Cir. Apr. 20, 2020) (*citing John Doe #1 v. Veneman*, 380 F.3d 807, 818 (5th Cir. 2004).

For the following reasons, this Court recommends that an injunction and the Petition for Writ of Habeas Corpus be GRANTED.

### 1. *There is a substantial likelihood of success on the merits.*

The controlling statute in this case, 8 U.S.C. § 1231(a)(1)(A), provides that the Attorney General has ninety days after an order of removal becomes final to deport the alien. The Supreme Court has held that detention of aliens beyond this ninety-day period is acceptable up to six months. *See Zadvydas v. Davis*, 533 U.S. 678, 701 (2001). This, however, does not mean that every alien not removed after six months must be released. "After this 6-month period, once the alien provides good reason to believe there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut the showing." *Id*. "[A]n alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." *Id*. "[D]etermining what the 'reasonably foreseeable future' really is, is a factual determination to be undertaken by the habeas court looking into

the circumstance and detention length of each individual petitioner." *Kane v. Mukasey,* 2008 U.S. Dist. LEXIS 141911, 2008 WL 11393137, at *4 (S.D. Tex. Aug. 21, 2008), *superseded by Kane v. Mukasey*, 2008 U.S. Dist. LEXIS 138999, 2008 WL 11393094 (S.D. Tex. Sep. 12, 2008) (finding habeas petition was moot after petitioner was deported).

The alien bears the initial burden of proof in showing that no such likelihood of removal exists." *Andrade v. Gonzales*, 459 F.3d 538, 543 (5th Cir. 2006). This burden does not require the alien to show that deportation will prove "impossible" or "show the absence of any prospect of removal—no matter how unlikely or unforeseeable . . . ." *Zadvydas*, 533 U.S. at 702. "In order to shift the burden to the Government, an alien must demonstrate that the circumstances of his status or the existence of the particular individual barriers to his repatriation to his country of origin are such that there is no significant likelihood of removal in the foreseeable future." *Galtogbah v. Sessions*, 2019 U.S. Dist. LEXIS 137399, 2019 WL 3766280, at *2 (W.D. La. June 18, 2019). However, "an alien's claim must be supported by more than mere speculation and conjecture." *Id.* (internal quotations and citation omitted).

Once the alien has met his initial burden, the burden shifts to the Government to "respond with evidence sufficient to rebut the alien's showing." *Zadvydas*, 533 U.S. at 701. "[F]or detention to remain reasonable, as the period of prior post

removal confinement grows, what counts as the 'reasonably foreseeable future' conversely would have to shrink." *Id*.

Petitioner has been held in ICE custody awaiting removal since November 21, 2019. Thus, the length of Petitioner's confinement is well in excess of the six-month presumptively reasonable period prescribed by the Supreme Court in *Zadvydas*. Petitioner asserts that she has cooperated fully with ICE and the removal efforts. See Rec. Doc. 1, pp. 6-7. According to Petitioner, her removal is not likely in the foreseeable future because "the intractable political and diplomatic standoff between the United States and Venezuela, as well as the suspension of all travel between the United States and Venezuela due to the coronavirus, which clearly has no reasonable end in sight, similarly establishes that Petitioner will not be removed to Venezuela in the reasonably foreseeable future." Doc. 14, p. 1.

Petitioner has provided good reason to believe there is no significant likelihood of removal in the reasonably foreseeable future. Thus, Petitioner has met her initial burden under *Zadvydas*. *See Hassoun v. Session*, 2019 U.S. Dist. LEXIS 451, 2019 WL 78984, at *4 (W.D.N.Y. Jan. 2, 2019) (finding that petitioner met his burden when he had shown that the countries with which he had an affiliation would not accept him).

The burden now shifts to the Government to rebut Petitioner's showing. Respondent counters that there is a significant likelihood of Petitioner's removal in

the reasonably foreseeable future. Respondent's argument relies upon a Declaration by Scott Ladwig, an ICE Assistant Field Officer. In the declaration, Ludwig states:

> Based on the foregoing and my experience and knowledge as a Deportation Officer, it is my belief that Petitioner's removal is imminent. The Venezuela consulate is generally cooperative in issuing travel documents for its citizens, and ICE regularly removes aliens to Venezuela. Once a travel document is issued, there is no foreseeable impediment to Petitioner's removal. Therefore, I believe there is a significant likelihood of removal in the reasonably foreseeable future.

Rec. Doc. 5-1, ¶ 10.

In his Reply, Petitioner argues that Ladwig's opinion is "the same unqualified opinion that ICE has been serving up in every case, no matter how long ICE has been trying unsuccessfully to remove a Venezuelan detainee to Venezuela." Doc. 14, p. 7.

It appears less likely today than it did in July of 2020 (when Ladwig signed his declaration) that Petitioner will be removed anytime soon. Neither ICE's belief that Petitioner will be removed, nor the information provided by Respondent, satisfy the government's burden to rebut Petitioner's showing that he will not be removed in the foreseeable future. The Court agrees with Petitioner's contention that although ICE is usually able to get travel documents and remove detainees to Venezuela, the lack of diplomatic relations between the United States and Venezuela, and worldwide travel restrictions due to the global COVID-19 pandemic, make it nearly

certain that ICE will not be able to do so for the foreseeable future. Rec. Doc. 14, p 13.

"[A] theoretical possibility of eventually being removed does not satisfy the government's burden once the removal period has expired and the petitioner establishes good reason to believe her removal is not significantly likely in the reasonably foreseeable future." *Kane*, 2008 U.S. Dist. LEXIS 141911, 2008 WL 11393137 at *5; *see also Andreasyan v. Gonzales*, 446 F. Supp. 2d 1186, 1189-90 (W.D. Wash. 2006) (finding that respondent had not rebutted petitioner's showing that he would not be removed when respondent repeatedly asked for "a few more weeks" to obtain travel documents). "[I]f [ICE] has no idea of when it might reasonably expect [Petitioner] to be repatriated, this Court certainly cannot conclude that his removal is likely to occur—or even that it might occur—in the reasonably foreseeable future." *Singh v. Whittaker*, 362 F. Supp. 3d 93, 102 (W.D.N.Y. 2019).

With no significant likelihood of removal in the foreseeable future, Petitioner's detention is now unreasonable. *See Ali v. Dep't of Homeland Sec.*, 2020 U.S. Dist. LEXIS 57886, 2020 WL 1666074 (S.D. Tex. Apr. 2, 2020) (granting writ when petitioner could not be removed due to travel restrictions to Pakistan). After more than a year of detention, "Petitioner's removal need not necessarily be imminent, but it cannot be speculative." *Hassoun*, 2019 U.S. Dist. LEXIS 451, 2019 WL 78984, at *6.

### *2. Petitioner's continued unconstitutional detention by Respondents constitutes irreparable injury sufficient to justify injunctive relief.*

Respondents' continued violation of Petitioner's constitutional right to substantive due process – her indefinite detention – is itself an irreparable injury. No further showing of irreparable injury is necessary. *Miss. Women's Med. Clinic v. McMillan*, 866 F.2d 788, 795 (5th Cir. 1989); *Am. Civil Liberties Union v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015), *see also* 11A C. WRIGHT, A. MILLER, & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE, § 2948.1 at 161 (2d ed. 1995) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.").

### *3. The balance of equities and public interest between the Petitioner and Respondents clearly favor the Petitioner in this case.*

Respondents note, appropriately, that the third and fourth factors, harm to the opposing party and the public interest, merge when the Government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 420 (2009). Respondents cite precedents suggesting that any order that enjoins a governmental entity from enforcing immigration laws or interferes with an adjudication constitutes an irreparable injury that weighs heavily against the entry of injunctive relief. Rec. Doc. No. 5, p 8. But Petitioner argues, and the Court agrees, that Respondents offer no explanation of how injunctive relief in this case "would negatively impact" the orderly and efficient administration of this country's immigration laws." *Id*. The removal statute itself,

8 U.S.C. 1231 (a) (3), addresses this concern. It provides that if the alien is not removed within the removal period, then pending the alien's ultimate removal from the United States, he or she "shall be subject to supervision under regulations prescribed by the Attorney General." *Id*. That is, even after this Court orders injunctive relief, Petitioner will be released by ICE under an order of supervision, which may include provisions requiring her to appear before an immigration officer periodically and to obey other reasonable restrictions on her conduct or activities. *Id*. She will be released with the same kind of supervision ICE has imposed on hundreds of other Venezuelans that ICE has already released in recognition that there is no likelihood of their removal to Venezuela in the reasonably foreseeable future

Accordingly,

**IT IS RECOMMENDED** that the Motion for Preliminary and Permanent Injunction and Petition for Writ of Habeas Corpus and (rec. doc. 1) be **GRANTED** requiring the **IMMEDIATE RELEASE** of Petitioner pending resolution of her immigration proceedings or removal, and under conditions to be specified by DHS/ICE but to exclude subsequent arrest and detention, unless she violates a condition of release, attempts to abscond, or commits any criminal offense.

**IT IS FURTHER ORDERED** that, given the urgency of the relief sought and recommended above, the objections periods set forth in 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b) be **EXPEDITED,** and that any party wishing to object to

this Report and Recommendation do so on or before Thursday, September 24, 2020. The District Judge will consider timely objections before issuing a final ruling. A party's failure to file written objections to the proposed factual findings, conclusions, and recommendations contained in this Report and Recommendation shall bar that party from attacking either the factual findings or the legal conclusions accepted by the District Judge, except upon grounds of plain error.

THUS DONE AND SIGNED in Chambers this 17th day of September, 2020.

_____
**PATRICK J. HANNA**
**UNITED STATES MAGISTRATE JUDGE**